# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

T&M INVENTIONS, LLC,
TIMOTHY M. PENDLEY, and
MICHAEL J. MCLAIN,

                Plaintiffs,

      v.                                  Case No. 12-C-0091

ACUITY BRANDS LIGHTING, INC.
d/b/a SUNOPTICS PRISMATICS
SKYLIGHTS,

                Defendant and
                Counterclaim Plaintiff,

    and

JEROME O. BLOMBERG,

                Defendant.

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

      This case involves alleged broken promises relating to the ownership rights of the Curbless Skylight, an invention for installing skylights to standing seam roofs on metal buildings. Plaintiffs Timothy Pendley and Michael McLain and Defendant Jerome Blomberg were named as co-inventors on the patent application describing the Curbless Skylight (the '176 Application). Plaintiffs contend that the parties agreed to create an independent entity to hold joint ownership rights in the Curbless Skylight, and that they also agreed to certain licensing terms and division of royalties that were expected to flow from sales of the product. They argue that Defendants led them

to believe that the parties were working together in partnership to develop the Curbless Skylight and to secure its ownership rights in the independent entity, but ultimately broke their promises when the rights in the '176 Application were instead assigned to Defendant Acuity Brands Lighting, Inc. As a result, Plaintiffs brought this action, alleging causes of action based on breach of contract, promissory estoppel, and unjust enrichment.[1]  For the reasons that follow, the defendants' motions for summary judgment will be granted.

## BACKGROUND

The facts concerning this matter have been set forth in the Court's previous decisions, but will be recounted here as relevant.  The relationship between Pendley, McLain, and Blomberg extends back to 2006, when they crossed paths at an industry trade show.  Pendley and McLain were employed by Bay Insulation Systems, Inc., and Bay Industries, Inc. (collectively, Bay), and Blomberg was a part-owner of Sunoptics Prismatic Skylights (Sunoptics).  As a result of their relationship, Bay and Sunoptics entered into a written exclusive distributorship agreement in 2007 under which Bay would sell Sunoptics' skylights to the metal building industry.  After the idea for the Curbless Skylight invention was developed, Pendley, McLain, and Blomberg eventually filed the '176 Application.

Plaintiffs contend that the parties then reached an oral agreement in the summer of 2009 to assign their rights in the Curbless Skylight and the '176 Application to a single, independent entity.

---

[1]Defendant Acuity Brands Lighting, Inc. has also filed a counterclaim against Plaintiffs, asserting claims for misappropriation, misrepresentation, tortious interference with contract, unjust enrichment, and declaratory relief. For purposes of this decision, the Court refers to T&M Inventions, LLC, Timothy M. Pendley, and Michael J. McLain collectively as Plaintiffs, and refers to Acuity Brands Lighting, Inc. and Jerome Blomberg collectively as Defendants.

2

Under the terms of the alleged oral contract, Plaintiffs assert the parties also agreed that Pendley and McLain would share half of any royalties made on the sale of the Curbless Skylight, and the exclusive distributorship agreement would remain in place, with Sunoptics granted an exclusive license to manufacture the Curbless Skylight and Bay granted an exclusive license to distribute it. Plaintiffs allege that Blomberg and Sunoptics ultimately breached that agreement by assigning their rights in the Curbless Skylight patent to Acuity Brands Lighting, Inc., on February 23, 2011 as part of Acuity's acquisition of Sunoptics.

Throughout 2009, the parties exchanged numerous draft agreements. They consistently indicated that the documents would be executed when agreed upon and signed. The drafts included proposed agreements concerning the business form of the independent entity–at different times, the parties considered establishing a Panamanian foundation, a Nevada LLC, and a Wisconsin LLC to control the rights to the Curbless Skylight and the '176 Application. They also exchanged draft patent agreements and distributorship and licensing agreements. In addition, they attempted to work out an agreement regarding royalties to flow from the Curbless Skylight. Pendley testified that he, McLain, and Blomberg also "had ongoing discussions about royalties and how to break them down." (Simmons Decl. Ex. A, Pendley Dep. 149-50, ECF No. 53-1.) It was "an ongoing conversation over a period of a year or so that we talked about royalties and how they're going to flow because we couldn't come to terms on the LLC." (*Id.*) The parties never agreed upon any of the drafts and no written agreement was executed.

On August 31, 2009, Plaintiffs allege they learned that rather than assigning his rights to an independent entity, Blomberg assigned his rights in the Curbless Skylight to Sunoptics. Plaintiffs apparently became aware that Sunoptics owned Blomberg's rights in the invention when Blomberg

3

presented Pendley and McLain with a draft patent agreement proposing that Pendley, McLain, and Sunoptics–not Blomberg–assign their rights in the Curbless Skylight to a Panamanian entity. (Burrows Decl. Ex. U, ECF No. 78-21.)  Indeed, on September 4, 2009, McLain sent Sunoptics an email asking for confirmation of the assignment because "our initial plan was to hold the patent as individuals and license to Sunoptics VS assign."  (Simmons Decl. Ex. G, ECF No. 53-7.)

On January 28, 2010, McLain sent Sunoptics draft distributor agreements, draft operating agreements for both a Wisconsin LLC and a Nevada LLC, and draft patent licensing agreement. (Simmons Decl. Ex. L, ECF No. 53-12.)  McLain followed up with an email to Grant Grable, a Sunoptics employee, on February 4, 2010, suggesting changes to the draft distributor agreement, and explaining that "until we get an agreement in place . . . we prefer ownership/trademarks to be pending."  (Simmons Decl. Ex. M, ECF No. 53-13.)  The email continued,

> I think it is fair to say that we have negotiated an agreement between Bay and Sunoptics that represents the best interests of both parties and have every confidence we will do the same between Sunoptics, Tim and Mike on the [Curbless Skylight intellectual property]. . . [I]f that agreement were already in place I doubt these issues would be presented.  However, we all know agreements are powerful documents and we need to make sure every word is evaluated for the potential of being misinterpreted.

(*Id*.)  Also in February 2010, McLain sent Blomberg and Grable another draft operating agreement for a Wisconsin LLC which made several changes to the terms of the agreement, including changing the LLC's members.  He received no response to his proposal.

Sometime in April 2010, Pendley and McLain learned that Blomberg and Sunoptics intended to sell their company.  Plaintiffs contend that Blomberg assured the plaintiffs in July 2010 that his rights to the Curbless Skylight would not be included in any sale.  (Hanson Decl. Ex. B, McLain Dep. 241, ECF No. 38-2.)  Pendley and McLain then organized T&M Inventions, LLC on July 16,

4

2010. They allege that they did so in reliance on Sunoptics' promise not to sell Blomberg's interest and in order to "fulfill their obligations" under the purported oral agreement, as well as to "protect their rights in the Curbless Skylight patent." (Am. Compl. ¶ 21.)

On July 17, 2010, McLain wrote a letter to Blomberg and Sunoptics, informing them of the creation of T&M and setting forth a new offer and draft patent agreement that "establishes a path for creating and maintaining the highest level of value" for the soon-to-be-released Curbless Skylight product and future patent. (Simmons Decl. Ex. P, ECF No. 53-16.) The letter extolled the benefits of licensing all the rights in the Curbless Skylight to a single entity. (*Id.*) McLain continued, noting that "our initial intentions" were that Pendley, McLain, and Blomberg's interests would all be held by one Nevada LLC, and explaining that the proposal was contingent on several "conditions" demanded by Pendley and McLain. (*Id.*) The email concluded "[w]e also understand your desire to sell Sunoptics and hope you appreciate the position we are taking in order to protect our mutual long term interest." (*Id.*)

Negotiations between the parties began to break down during summer and fall 2010. On August 14, 2010, McLain sent Sunoptics an email attaching a revised draft operating agreement, and stating, "[w]e would like to have this document signed by month's end." (Simmons Decl. Ex. R, ECF No. 53-18.) On September 13, 2010, McLain wrote to Grable stating, "I do not understand why no one has responded to the agreements we prepared to secure a safe haven for the patent(s). I understand that everyone is busy, but this is extremely important and a matter of business that needs to be consummated." (Simmons Decl. Ex. S, ECF No. 53-19.) On October 15, 2010, McLain stated that the "LLC issue needs to [be] worked out one way or the other. Tim and I will sign an agreement for our interest with or without you guys . . . ." (Simmons Decl. Ex. T, ECF No. 53-20.)

On October 27, 2010, McLain again emailed Grable and Blomberg, informing them that he and Pendley were "re-writing the LLC to simply hold our interest in [the Curbless Skylight] with no other conditions" because it was their understanding that "Sunoptics is no longer interested in assigning their portion of the LLC to a single entity outside of the company."  (Simmons Decl. Ex. U, ECF No. 53-21.)

On November 26, 2010, McLain wrote to Sunoptics with another proposal regarding ownership of the patent rights in which he stated "[w]e have already drafted an agreement for you to review and present to your suitor [Acuity] but wanted to share the jist before sending as we want to assure everyone is on the same page with respect to intent of the agreement which includes protecting the long term (permanent) interest of *all* parties."  (Grable Decl. Ex. B, ECF No. 41.) Subsequent emails in December revealed that no agreement could be reached on the terms of a royalty agreement either.  McLain rejected a proposal offering a sliding scale royalty agreement, calling it a "deal breaker" for T&M to receive anything less than a 10 percent royalty.  (Simmons Decl. Ex. W, ECF No. 53-23.)  McLain rejected similar proposals to assign the plaintiffs' intellectual property rights to Sunoptics in exchange for 10 percent royalty arrangement, stating "we are not willing to assign our rights to Sunoptics . . . [but] we will grant an exclusive license to Sunoptics provided they assign their right to T&M."  (*Id.*)  On December 13, 2010, Pendley sent Grable yet another proposed written patent agreement that was never executed.  (Simmons Decl. Ex. X, ECF No. 53-24; Ex. A, Pendley Dep. 178-80, ECF No. 53-1.)  Meanwhile, the 2007 exclusive distributorship agreement between Sunoptics and Bay terminated on December 31, 2010. (Am. Compl. ¶ 11.)

6

Unable to reach a deal, the parties' negotiations further deteriorated in February 2011. On February 7, 2011, Pendley and McLain executed written assignments transferring their rights in the Curbless Skylight to T&M. On February 8, 2011, McLain sent Grable an email expressing "the frustration Tim and I have been experiencing in our unsuccessful attempts to unify the IP under a single umbrella and to have a formal and binding agreement for all of us to move forward." (Simmons Decl. Ex. Z, ECF No. 53-26.) On February 9, 2011, McLain followed up with an email to Grable, stating that effective February 11, 2011, Plaintiffs would "kill" the '176 Application and file a new application in its place that named Pendley and McLain as the "sole inventors" of the claims they brought to the '176 Application. (Simmons Decl. Ex. AA, ECF No. 53-27.) The email stated: "T&M will postpone submission of this application until the end of the month to provide one final opportunity to reach a legally binding and durable agreement with Sunoptics. The agreement **must be consummated** on or before the end of this month or the referenced application will be filed." (*Id.* (emphasis in original).) The email explicitly presented Sunoptics with two options: (1) remove Blomberg's name as a co-inventor from the existing '176 Application and form a new "legally binding agreement" in which Sunoptics would be granted an exclusive license to manufacture and distribute the invention and in exchange, Sunoptics would pay for 50 percent of the costs associated with foreign filings and pay T&M a royalty of 10 percent of the net value of sales "as has been demonstrated in the past."; or (2) "Sunoptics does not agree to the above in which case T&M submits the new application and let's [sic] the chips fall where they may." (*Id.*)

Sunoptics did not accept McLain's offer. On February 23, 2011, Acuity purchased Sunoptics, and with it, the rights to the Curbless Skylight. In response to an email from Grable, McLain wrote "it appears we have come to the end of our journey. . . . We regret that we were

7

unable to secure an enduring relationship as it relates to this invention." Ultimately, the parties "never could come to total agreement where we got ink on the document." (Simmons Decl. Ex. A, Pendley Dep. 149-50, ECF No. 53-1.) In March 2011, Acuity paid T&M a 10 percent royalty on sales of the Curbless Skylight, but ceased further payments. Pendley and McLain subsequently filed four continuation-in-part patent applications that exclude Blomberg's contributions to the Curbless Skylight and do not name him as an inventor. They also filed patent applications to protect their rights in the Curbless Skylight invention in Canada, Mexico, China, Australia, India, and the European Union.

## LEGAL STANDARD

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the non-movant's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving

8

party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Defendants contend that all of the plaintiffs' claims should be dismissed as there is no genuine dispute of material fact and no reasonable jury could find for the plaintiffs. First, they argue Plaintiffs' breach of oral contract claim should be dismissed because the parties never reached a meeting of the minds regarding the essential terms of an agreement. They argue that the parties did not intend to be bound by their oral discussions and in any case, the material terms of any "agreement" were constantly in flux. They also contend that the plaintiffs have suffered no damages as a result of any alleged breach. Blomberg also filed a motion for summary judgment that additionally argues that as to him, any breach of oral contract claims are barred by a two-year statute of limitations. Second, Defendants argue that Plaintiffs' promissory estoppel claim should be dismissed because it was not properly pled and because Plaintiffs were induced by their own self-interest rather than any alleged promises by the defendants. Finally, Defendants contend Plaintiffs have not properly pled unjust enrichment and have not conferred an actionable benefit on the defendants. In response, Plaintiffs argue that there are genuine disputes of material facts as to each of these claims.

## A. Breach of Oral Contract

It is undisputed that the parties never agreed to a written contract. Rather, Plaintiffs argue that there was a binding oral contract that committed the parties to form an independent entity to protect their respective interests in the Curbless Skylight. In order for there to be an enforceable

9

oral contract, there must be a meeting of the minds between the parties with respect to the essential terms of the agreement and the parties must intend to be bound by the oral agreement. *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 502 (7th Cir. 1998) (citing *Witt v. Realist, Inc.*, 18 Wis. 2d 282, 297, 118 N.W. 85, 93 (Wis. 1962); *see also Ziolkowski v. Caterpillar, Inc.*, 800 F. Supp. 767, 779 (E.D. Wis. 1992)). A "meeting of the minds" requires mutual assent as to all material terms. *Witt*, 18 Wis. 2d at 297, 118 N.W. at 93. In addition, the material terms must be "definite and certain" to be enforceable. *Superview Network, Inc. v. SuperAmerica, a Div. of Ashland Oil, Inc.*, 827 F. Supp. 1392, 1396 (E.D. Wis. 1993); *Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc.*, 2004 WI App 134, ¶ 8, 275 Wis. 2d 349, 685 N.W.2d 564.

To determine the intent of the parties to be bound by an oral agreement, the court undertakes an objective analysis. Effect is given to the parties' intent to contract "if such intent is discernible from their conduct or the contract language." *Herder*, 2004 WI App 134, ¶ 8; *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) (quotations omitted) (determining a party's intent "does not invite a tour through [a plaintiff's] cranium, with [the plaintiff] as the guide"); *Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Commc'ns Int'l Union, AFL-CIO*, 20 F.3d 750, 752 (7th Cir. 1994) ("[A] literal meeting of the minds is not required for an enforceable contract, which is fortunate, since courts are not renowned as mind readers."). If the subjective intent of one party could unilaterally bind another to an oral contract, parties may become wary to enter into negotiations for fear of unwittingly "agreeing" to a deal. *Skycom*, 813 F.2d at 814.

Objectively viewing the numerous written communications between the parties, the only reasonable conclusion one can reach is that the parties had not reached an agreement. The continuous chain of email and written communications reveal that no sufficiently definite agreement

10

was ever formed, and even if the parties had agreed in principle, they had intended to be bound only by a written contract executed after they had negotiated the terms. To this end, the defendants argue that Plaintiffs' oral contract claim must be dismissed because the undisputed facts show that the parties never intended to be bound by mere oral discussions. Under Wisconsin law, such "agreements to agree" do not create binding obligations. *Witt*, 18 Wis.2d at 298, 118 N.W.2d at 93-94 ("Mere agreements to reach a contract in the future are not enforceable."). Where parties do not intend to be bound until all negotiations are complete, no contract is formed. *Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 280 (7th Cir. 1979) ("It is well settled that no contract is formed 'where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document.'") (citing 1 A. Corbin, CONTRACTS § 30 at 97 (1973 ed.)); *Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978) ("Even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed. On the other hand, if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed.").

This approach minimizes the risks of negotiation for parties engaged in complex commercial transactions. *Skycom*, 813 F.2d at 814. "A rule of law that could bind the parties to a deal in the midst of resolving . . . uncertainties–perhaps worst of all, inject the random element of a jury's determination about subjective intent–would make transactions riskier." (*Id.*) ("The parties should be able to choose with precision the point at which they can no longer back out."); *see also*

11

*Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir. 1984) (finding as a matter of law, where parties negotiate toward a formal contract, they are not bound until the closing, even if they took pains to determine the details of the agreement and produced an agreement "in principle" with all of the terms in writing); *Gruen*, 608 F.2d at 279-80 (finding no oral contract existed as a matter of law because the parties' statements showed "nothing more than ongoing negotiations" and any conduct that pointed to a meeting of the minds was negated by statements indicating that there would be no agreement until the negotiations were complete). Here, the parties agreed to negotiate with each other toward a formal contract, but never reached a mutually satisfactory deal. That a contract falls through because one party backs out or demands to renegotiate is immaterial because "that is simply the definition of not (yet) being bound." *Skycom*, 813 F.2d at 816 (citing *Reprosystem*, 727 F.2d at 261-63).

Aside from the plaintiffs' claims that they believed they had a deal, there is no evidence from which to infer the parties had done anything more than agree to negotiate the terms of a mutually beneficial business relationship under which the parties would protect their interests in what they believed would be a lucrative invention. The Plaintiffs' own communications bear this out with statements such as: "until we get an agreement in place," "if that agreement were already in place," "[w]e would like to have this document signed by month's end," "it is extremely important and a matter of business that needs to be consummated." McLain also indicated his understanding that the parties intended to be bound by a formalized, written contract, stating, "agreements are powerful documents and we need to make sure every word is evaluated for the potential of being misinterpreted." (Simmons Decl. Ex. M, ECF No. 53-13.) Moreover, McLain's February 8, 2011 email plainly discussed the parties' "unsuccessful attempts to unify the IP under

12

a single umbrella and to have a formal and binding agreement." (Simmons Decl. Ex. Z, ECF No. 53-26.) Further expelling any inferences to the contrary, McLain offered "one final opportunity *to reach a legally binding and durable agreement* with Sunoptics" and stated the agreement "must be consummated" by the end of the month. (Simmons Decl. Ex. AA, ECF No. 53-27.) Pendley likewise summarized the failed negotiations by reflecting that the parties "never could come to total agreement where we got ink on the document." (Simmons Decl. Ex. A, Pendley Dep. 149-50, ECF No. 53-1.)

Moreover, the purported oral contract is unenforceable because it was not sufficiently definite or clear. Viewing the evidence in a light most favorable to Plaintiffs, it is apparent that there was no meeting of the minds on a number of essential contract terms. While the parties may have invested substantial time, effort, and resources into the negotiations, the terms of their agreement can only be described in overly broad strokes. Almost all of the essential terms were in flux up to the date the relationship ultimately broke down, as evidenced by the parties' continuous exchange of drafts and proposed agreements. They never even agreed on foundational terms such as the form of the entity to be established. The parties negotiated first over Blomberg's proposal to create a Panamanian foundation, then McLain proposed a Nevada LLC, and then a Wisconsin LLC. It is undisputed that the parties never agreed to the terms of any of these proposals. Not only did the parties fail to even determine the form of the entity to which they would assign their rights, they also never agreed that the entity would be "independent." In 2010, Plaintiffs rejected Sunoptics' proposal to have all parties assign their interests to Sunoptics, and responded with their own proposal to have Sunoptics assign its interest to T&M.

13

Broad understandings or intentions do not create an enforceable and actionable contract. At most the parties created an outline of a business plan and had a general goal in mind. This is not enough to bind the parties to their so-called agreement. Moreover, the parties here ultimately bargained to secure rights in intellectual property and to determine the terms upon which such property would be owned, licensed, manufactured, and distributed. Given the complexities of the transaction, it is particularly important that the terms be concrete and definite. An amorphous understanding that the parties desired to form an independent entity together in order to maximize their profits on an invention is simply not enough to hold one party to a "bargain" to which they were never able to agree on acceptable terms. An unsuccessful negotiating partner cannot be permitted to essentially force the agreement on a party who has walked away from the negotiating table.

Plaintiffs point to the fact that Blomberg and Sunoptics paid Pendley and McLain a 10 percent royalty in the absence of a written contract, and therefore infer that the parties had consummated a valid oral agreement. But they do not explain why these payments were connected to the parties' alleged agreement to form an independent entity. To the contrary, it is apparent the 10 percent royalty payments were separate from any alleged oral contract to form an independent entity. Indeed, in a July 17, 2010 letter to Sunoptics, McLain requested as a "condition" of his proposed agreement that he and Pendley continue to receive a 10 percent royalty on sales of the Curbless Skylight, consistent with their rights *under the exclusive distributorship agreement between Bay and Sunoptics*. (Simmons Decl. Ex. P, ECF No. 53-16.) Furthermore, McLain's October 27, 2010 email to Sunoptics explained that although he understood that Sunoptics was "no longer interested" in assigning its interest to "a single entity outside the company," he wanted to

14

ensure that despite this deal falling through, he and Pendley would still be paid their share of the royalties on the Curbless Skylight sales to date. (Simmons Decl. Ex. U, ECF No. 53-21.)

Even if Plaintiffs could succeed in proving that an oral contract existed, their claim fails because McLain repudiated any existing contract before the alleged breach occurred. Plaintiffs allege that the defendants' breach of contract consisted of Blomberg and Sunoptics assigning their rights in the Curbless Skylight and the '176 Application to Acuity on February 23, 2011. But, taking all of Plaintiffs' allegations as true, it is apparent that there was no contract to breach on February 23, 2011. McLain's February 9, 2011 email to Grable threatening to "kill" the '176 Application unless Sunoptics accepted Plaintiffs' proposal repudiated any oral contract that did exist and excused the defendants their obligation to perform. "[A] repudiation of the terms of a contract, and a demand for performance substantially different from that provided for in such contract, constitutes an anticipatory breach which entitles the other contracting party to rescind." *Morn v. Schalk*, 14 Wis. 2d 307, 316, 111 N.W. 2d 80 (1961). The entire purpose of the purported oral agreement was to secure the parties' rights in the Curbless Skylight and the '176 Application, yet McLain's ultimatum proposed entirely new terms, including removing Blomberg as a co-inventor on the '176 Application. The email threatened to let the '176 Application "die" unless the parties could "reach a legally binding and durable agreement." Thus, McLain clearly expressed his intent to only be bound by a formal, written agreement going forward–one which contained numerous conditions that were materially different from alleged oral contract Plaintiffs claim was breached on February 23, 2011.

Based on the foregoing, there is no basis upon which to conclude the parties had agreed upon a valid and enforceable contract with definite and certain terms. Therefore, Plaintiffs' breach of oral contract claim must be dismissed.

15

**B.      Promissory Estoppel**

In the alternative, Plaintiffs invoke the equitable doctrine of promissory estoppel. "The doctrine of promissory estoppel provides an alternative basis to consideration for treating a promise as a contractual undertaking." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 868 (7th Cir. 1999). In order to prevail on a promissory estoppel theory, a party must prove (1) that there was a promise which the promisor should "reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee"; (2) the promise induced such action or forbearance; and (3) injustice can only be avoided by enforcement of the promise. *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (Wis. 1965). While the first two requirements of promissory estoppel present issues of fact which ordinarily will be resolved by a jury, the third requirement is one that involves a policy decision by the court. (*Id.*)

Plaintiffs contend that the defendants made two promises. First, the defendants promised to assign their rights in the Curbless Skylight to an independent entity that would permit the co-inventors to group their ownership rights for their mutual benefit. Second, Blomberg and Sunoptics promised they would not transfer the rights in the Curbless Skylight in any sale of the company. Plaintiffs contend that had they not been induced to rely on these promises, they would have sought patent protection alone rather than including Blomberg as a co-inventor. Likewise, they contend they were forced to expend substantial out-of-pocket costs associated with setting up the independent entity. Finally, they argue that they would have continued to collect the 10 percent royalty from Sunoptics and the 15 percent commission from Bay.

"Even when a contract fails to become effective as a whole, particular terms may bind under the doctrine of promissory estoppel." *Skycom*, 813 F.2d at 817 ("[A] promise that is designed to

16

induce commercially reasonable detrimental reliance will be enforced to the extent necessary to compensate the relying party for his injury in relying."). A promise must be "definite enough to induce a reasonable person to rely" for promissory estoppel to provide a basis for recovery. *All-Tech Telecom*, 174 F.3d 862 at 868 (citing *Hoffman*, 26 Wis.2d at 698, 133 N.W.2d at 275). Promissory estoppel is a gap-filling remedy, "not a doctrine designed to give a party . . . a second bite at the apple in the event it fails to prove a breach of contract." *Id.* at 870 (quotations omitted). The Seventh Circuit has warned that Plaintiffs cannot use equitable principles to transform complex negotiations into a "no lose" situation for themselves:

> [e]very businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement. It is difficult to find the degree of injustice necessary for recovery in estoppel when the promises incorporate so many contingencies and complexities and as a matter of sound business practice are to be formalized before the parties carry them out.

*Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 282 (7th Cir. 1979). In *Gruen*, the court concluded that the parties were represented by "sophisticated businessmen," and it was not a situation where one party with superior knowledge took advantage of the other party; as such, the "losses are best left where they have fallen." *Id.* at 281-82. *See also RCM Supply Co., Inc. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078 (4th Cir. 1982) (rejecting promissory estoppel claim where plaintiffs expended large sums of money based on defendants' oral promise to provide favorable terms on a line of credit because such reliance "clearly exceeds the bounds of commercial reasonableness").

Here, the parties' agreement contained many contingencies and was a complex agreement between negotiating business partners. There is no reason for the court to insert itself into the business dealings of parties who were bargaining on equal footing. Plaintiffs seem to imply that the

17

defendants strung them along unwittingly and misled them into thinking an agreement had been reached. However, the communications between the parties between 2009 and 2011 tell a different story–one in which the parties knowingly engaged in extended negotiations, exchanging numerous drafts and proposals. As such, to the extent that Plaintiffs detrimentally relied on any promises made by the defendants, such reliance was not commercially reasonable. There is no evidence from which to infer that justice in any way requires that the plaintiffs be compensated for the defendants' actions, and consequently, this claim is dismissed. To find otherwise would expose the possibility that any party who unsuccessfully negotiates an agreement could claim it should be compensated for its efforts or out-of-pocket costs.

### C. Unjust Enrichment

Plaintiffs also assert an unjust enrichment claim. Unjust enrichment, or quasi-contract, provides a means of recovery where "the defendant has received a benefit from the plaintiff and the retention of the benefit by the defendant is inequitable." *Arjay Inv. Co. v. Kohlmetz*, 9 Wis. 2d 535, 538, 101 N.W.2d 700, 702 (Wis. 1960). Unjust enrichment provides a means of recovery where "there is no contract in fact [but] the parties will be treated under the circumstances as if there had been a contract. *Id*. To succeed on a claim for unjust enrichment, a plaintiff must show that: (1) he or she conferred a benefit; (2) the defendant had knowledge or appreciation of the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying plaintiff its value. *Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis. 2d 653, 671, 553 N.W.2d 257, 265 (Wis. Ct. App. 1996); *Puttkammer v. Minth*, 83 Wis.2d 686, 689, 266 N.W.2d 361 (Wis. 1978). "It is the duty of such a person to return the property or its value, which is the basis for recovery, not his promise, agreement, or intention." *Arjay*, 9 Wis. 2d at 539, 101 N.W.2d at 702. Merely because

18

a plaintiff has expended time and resources on a project does not automatically entitle the party to recovery under unjust enrichment. *Halverson v. River Falls Youth Hockey Ass'n*, 226 Wis. 2d 105, 115-16, 593 N.W.2d 895, 900 (1999) (citing *Management Computer Servs. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 188-89, 557 N.W.2d 67, 80 (1996) (stating "[a] plaintiff's expenditure alone does not, however, support an unjust enrichment claim")).

Plaintiffs contend that the defendants "have benefitted from a long line of broken promises" and received benefits conferred on them by Plaintiffs, including participation in the joint ownership of the '176 Application, and the subsequent benefit of putting the entire Curbless Skylight invention on the market. Likewise, Plaintiffs assert that they conferred valuable services, materials, and industry "know-how" on the defendants. But the Plaintiffs have taken back the supposed benefit of including Blomberg on the '176 Application, as they have allowed the patent to die and have instead filed their own continuation patents excluding Blomberg's contributions. In addition, the plaintiffs must do more than show that they conferred a benefit upon the defendants–they must demonstrate that it would be unjust for the defendants to retain those benefits. Plaintiffs fail to meet their burden here.

Again, the communications between the parties demonstrate that they believed they could create a mutually beneficial relationship. Among other things, Plaintiffs brought to the relationship their connections with Bay and their ideas for the Curbless Skylight, and Blomberg and Sunoptics brought their manufacturing and experience in the skylighting market. The plaintiffs recognized that "if we were all to go our separate ways, we would end up destroying the potential proprietary value of the invention as each of the inventors could license, sublicense, or sell their respective interest to other parties." (Simmons Decl. Ex. P, ECF No. 53-16.) Thus, Plaintiffs proposed

19

agreements "that establish[] a path for creating and maintaining the highest level of value of the soon to be released and subsequent patent(s) of the Curbless Multiple Skylight and Smoke Vent System" in order to minimize the otherwise inevitable result that the parties would "do battle in the market place for share and volume competing head to head." (*Id.*) Plaintiffs clearly sought to advance their own interests in entering a business relationship with the defendants. Moreover, they remain in control of their invention and have sought patent protection for their contributions. This fact alone distinguishes this case from *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47 (1st Cir. 2009), on which Plaintiffs so heavily rely. In that case, the defendant convinced the plaintiff to cancel its individual patent application and instead file an application naming the defendant's employee as a co-inventor. Here, the '176 patent application that listed Blomberg, or Sunoptics, as a co-inventor has been abandoned, and Plaintiff have filed their own applications in which they seek rights that extend back to the earlier application date. Given these facts, it is difficult to see how Plaintiffs provided more benefits than they received, much less that Defendants accepted the so-called benefits "under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Lawlis v. Thompson*, 137 Wis. 2d 490, 497, 405 N.W.2d 317, 319 (1987). Therefore, Plaintiffs cannot prevail on their unjust enrichment claim and it must be dismissed.

## CONCLUSION

A jury could only reach one decision in this case: the parties engaged in extended, but ultimately unsuccessful negotiations in an effort to form an agreement that would protect their respective interests and investment in the Curbless Skylight and the '176 Application. Viewing the

20

evidence in a light most favorable to Plaintiffs, no jury could find that the defendants breached an oral contract, and Plaintiffs cannot recover on an equitable basis either. Therefore, the defendants' motions for summary judgment must be granted. Having found that Plaintiffs' claims for breach of oral contract, promissory estoppel, and unjust enrichment must be dismissed as a matter of law, there is no need to separately address Blomberg's argument that the claims against him are time barred. Therefore, Defendant Jerome Blomberg's motion for summary judgment (ECF No. 45) is **GRANTED** and all claims against him are dismissed with prejudice. In addition, Acuity Brands Lighting Inc.'s motion for summary judgment dismissing all of Plaintiffs' claims (ECF No. 39) is **GRANTED**. This matter will remain scheduled for a final pretrial conference on May 3, 2013 to address Acuity Brands Lighting Inc.'s counterclaim.

  **SO ORDERED** this __23rd__ day of April, 2013.

         s/ William C. Griesbach
         William C. Griesbach, Chief Judge
         United States District Court

21